**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
UNITED STATES OF AMERICA,                            )
*ex rel.* DIGITAL HEALTHCARE, INC.,                  )
                                                    )
                        Plaintiff/Relator,           )
                                                    )
            v.                                       )          Civil Action No. 06-1299 (RBW)
                                                    )
AFFILIATED COMPUTER SERVICES, INC.,                  )
                                                    )
                        Defendant.                   )
_____ )

**Memorandum Opinion**

The plaintiff/relator, Digital Healthcare, Inc. ("Digital"), brings this <u>qui tam</u> action against defendant Affiliated Computer Services, Inc. ("Affiliated") under the False Claims Act, 31 U.S.C. §§ 3729-3732 (2006), as well as the false claims act statutes of several states and the District of Columbia. <u>See</u> First Amended Complaint ("Am. Compl.") ¶¶ 45-138. Digital alleges that by not implementing certain technology, Affiliated is failing to take reasonable measures to determine whether Medicaid claimants have third-party insurance, and is therefore facilitating the submission of false claims to the federal government for Medicaid payments. <u>See</u> <u>id.</u> ¶¶ 11-44. Currently before the Court is Affiliated's Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting that the Court lacks subject-matter jurisdiction over this case and that the plaintiff/relator has failed to plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b). Upon reviewing the Amended Complaint, the defendant's motion, the plaintiff/relator's opposition, and the legal memoranda submitted in support of those

filings,[1] the Court concludes for the reasons below that it has subject-matter jurisdiction over the plaintiff/relator's claims, but that the plaintiff/relator has failed to plead fraud with the required particularity. Affiliated's motion to dismiss will therefore be granted in part and denied in part.

## I. INTRODUCTION

### A. <u>Statutory Background</u>

A brief overview of the Medicaid program will help elucidate the plaintiff/relator's allegations in this case. Medicaid is a joint federal-and-state-funded program that provides medical assistance to individuals whose income and financial resources are insufficient to pay the cost of necessary medical services. <u>See</u> <u>Ark. Dep't of Health & Human Servs. v. Ahlborn</u>, 547 U.S. 268, 275 (2006). All states and the District of Columbia have elected to participate in the Medicaid program, <u>id.</u>; <u>see</u> <u>D.C. Hosp. Ass'n v. District of Columbia</u>, 224 F.3d 776, 778 (D.C. Cir. 2000) (noting the District of Columbia's Medicaid plan), and pay qualified health providers for a broad range of covered services provided to eligible beneficiaries. "The federal government then reimburses states for a share of their expenditures. The federal share of each state's program expenditures ranges from 50 to 83 percent." Def.'s Mem., Declaration of Douglas W. Baruch ("Baruch Decl."), Exhibit ("Ex.") 1 (United States Government Accountability Office, GAO 06-862, Medicaid Third-Party Liability, Federal Guidance Needed to Help States Address Continuing Problems (2006)) ("2006 GAO Report") at 7.

"States have considerable flexibility in designing and operating their Medicaid programs, although they must comply with [certain] federal requirements." <u>Id.</u> at 2. Operating a state

---

[1] In addition to the defendant's motion, the Court also considered the following documents in reaching its decision: (1) Defendant Affiliated Computer Services, Inc.'s Memorandum of Points and Authorities in Support of its Motion to Dismiss ("Def.'s Mem."); (2) Plaintiff Digital Healthcare, Inc.'s Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp'n"); and (3) Defendant Affiliated Computer Services, Inc.'s Reply Memorandum in Further Support of its Motion to Dismiss the First Amended Complaint ("Def.'s Reply"). The Court also considered, where appropriate, the exhibits submitted with the various filings.

Medicaid program requires the states to engage in a number of activities such as determining the eligibility of individuals who apply for Medicaid assistance, determining what benefits Medicaid will cover, determining which providers are qualified to furnish benefits, processing claims, and maintaining control mechanisms to minimize improper payments and fraud.  Def.'s Mem., Baruch Decl., Ex. 2 (Congressional Research Service, State Medicaid Program Administration: A Brief Overview (2005)) ("CRS Overview") at 2.  To help fund these programs, state Medicaid agencies receive a quarterly advance from the federal government based on certain estimates, 42 U.S.C. § 1396b(d)(1) (2006), 42 C.F.R. § 430.30(a) (2010), and at the close of each quarter a state submits an accounting of its actual Medicaid expenditures, 42 C.F.R. § 430.30(c).  The states submit this information on a Form CMS-64, entitled Quarterly Medicaid Statement of Expenditures for the Medical Assistance Program.  Id.

Federal law requires each state to designate a single state agency to administer or supervise the administration of its Medicaid program.  Def.'s Mem., Baruch Decl., Ex. 2 (CRS Overview) at 1.  This agency, in turn, will often contract with other public or private entities to perform various Medicaid program functions.  Id.  For example, some states contract with private companies to operate Medicaid Management Information Systems, which are programs used for claims and other data processing purposes.  Id.

 Medicaid is intended be a "payer of last resort."  Ahlborn, 547 U.S. at 291.  Thus, "if a Medicaid beneficiary also has another source of payment for health services, that source is to pay instead of Medicaid."  Def.'s Mem., Baruch Decl., Ex. 1 (2006 GAO Report) at 1.  In general, state Medicaid agencies are required whenever possible to avoid paying for services for which the state agency has reason to believe another party is legally liable.  Id. at 13; see 42 C.F.R. § 433.139(b).  Therefore, a state Medicaid agency must "take reasonable measures to determine

the legal liability of the third parties who are liable to pay for services furnished under the" state Medicaid plan. 42 C.F.R. § 433.138(a).

## B.    Factual and Procedural Background

The following information is alleged in the plaintiff/relator's Amended Complaint. The plaintiff/relator is an "information technology provider and a licensee of intellectual property involving the automated coordination of insurance information between payers and health care providers." Am. Compl. ¶ 1. The defendant is a corporation that "operates as a Medicaid fiscal agent in thirteen states . . . and offers [a] myriad [of] services to the government, including managed care enrollment, eligibility administration, Medicaid claims processing, provider relations[,] and third-party liability." Id. ¶ 9. The defendant processes "over 475 million Medicaid healthcare claims annually" and is "the nation's largest Medicaid pharmacy benefits manager."[2] Id. "Since December 17, 2002, [the] defendant has operated as a Medicaid fiscal agency and/or Medicaid pharmacy benefits manager in the District of Columbia, the Commonwealth of Massachusetts, and the states of Florida, Montana, Tennessee, Louisiana[,] and Texas, as well as other states." Id. ¶ 16.

At some point between September 2000 and December 2002, Digital conducted a national cost analysis to measure the magnitude of problems associated with "coordination of benefits," a term in the Medicaid context that refers to "determining which payer among multiple available payers is liable for a claim for health care services" or "whether a claimant has any other third[-]party insurance." Id. ¶¶ 22(a)-(b). Several health care organizations, including Affiliated, voluntarily participated in the study. Id. ¶ 22(b). Affiliated provided data for Digital

---

[2] Among other responsibilities, pharmacy benefits managers process and pay prescription drug claims submitted on behalf of Medicaid recipients. Def.'s Mem. at 6; see also Def.'s Mem., Baruch Decl., Ex. 1 (2006 GAO Report) at 8.

to use in the study, which included Affiliated's Medicaid eligible patients from March, June, and September 2000, from six of the twenty-six states in which Affiliated processes pharmacy claims. Id. ¶¶ 22(b), (j). In conducting the study, Digital "compared the eligibility data submitted by [Affiliated] with a database containing over twenty million individuals that had private third[-]party insurance." Id. ¶ 22(c). A match between the two data sets "indicated a [coordination of benefits] error, i.e., the individual in [Affiliated's] Medicaid database had alternative third[-]party coverage." Id. Although some health plans do not cover all prescriptions, the study did "not account for the nuances of the insured patients' health plans," and therefore "assumed that no insured individuals should have submitted health care claims to Medicaid." Id. ¶ 22(d).

The results of the study "indicated that a large portion of the patients for whom [Affiliated] had processed payments, over one-third of all patients in some states, had private third[-]party insurance." Id. ¶ 22(e). The percentages differed across the states examined, ranging from 21.47% to 35.99% of Affiliated's patient population in each state. See id. ¶¶ 22(f)-(h). The study made assumptions regarding the number of claims each patient would submit each month as well as the average cost of each claim, id. ¶¶ 22(i)-(j), and the results of the study "provide[] an extremely conservative estimate of [Affiliated's] improper billing," id. ¶ 22(j). Based on these assumptions, Digital estimated that Affiliated "improperly submitted at least [$20 million] in claims to state Medicaid programs in the six states analyzed in the National [Coordination of Benefits] Cost Analysis, each month." Id. ¶ 22(l). Accounting for the average federal share of these costs, Digital alleges that "over half of the funds that were used to pay the claims that [Affiliated] improperly submitted to state Medicaid programs each month were provided by the federal government." Id. ¶ 22(m).

On December 17, 2002, Patrick Lawlor, W.K. Smith, and Tom Sharpley, representatives of Digital, presented the National Cost Analysis results to officers from Affiliated. <u>Id.</u> ¶ 23. The representatives from Digital explained the results of the study, "informed [Affiliated's officers] of the magnitude of their [coordination-of-benefits] problem," and "explained that [Affiliated] was not complying with applicable Medicaid laws and that it was submitting millions of dollars in Medicaid claims each month that were properly billable to private third[-]party insurers." <u>Id.</u> At this same meeting, Digital's representatives informed Affiliated "of available software that would remedy their [coordination-of-benefits] problem, prevent submission of illegal Medicaid claims, and bring [Affiliated] into compliance with the law." <u>Id.</u> ¶ 24. The Digital representatives stated that this automated coordination-of-benefits software would "completely eradicate[] [Affiliated's] improper Medicaid billing by identifying liable third[-]party insurers at the moment that claims were paid." <u>Id.</u> ¶ 27. Affiliated refused to implement the software. <u>Id.</u> ¶ 29.

On January 16, 2004, Joe Glorioso, a Digital representative, met with Affiliated representatives again and "offered to solve [Affiliated's coordination-of-benefits] problem and to bring [Affiliated] into compliance with Medicaid laws and regulations." <u>Id.</u> ¶ 31. Affiliated "again refused to resolve its [coordination-of-benefits] problem and become compliant with applicable Medicaid law." <u>Id.</u> Thereafter, Digital filed a Complaint in this Court on July 21, 2006, and filed an Amended Complaint on June 29, 2007. Both were filed under seal pursuant to 31 U.S.C. § 3730(b)(2).

There are eight counts set forth in the Amended Complaint, all based on the events outlined above. <u>See</u> Am. Compl. ¶¶ 45-138. In general, the Amended Complaint alleges that "[s]ince December 17, 2002, [Affiliated] has caused tens of thousands of improper claims to be

submitted to Medicaid each month in its capacity as a Medicaid pharmacy benefits manager . . . and as a Medicaid fiscal agent."  Id. ¶ 37.  Count One asserts violations of the federal False Claims Act, id. ¶¶ 45-58, and alleges that Affiliated

> knowingly presented or caused to be presented false or fraudulent claims for payment or approval to an officer or employee of the United States, including claims for reimbursement for medication and services rendered to Medicaid patients whose third party insurance covered the medication and services, and which should have been presented to those third party insurers pursuant to applicable Medicaid laws,

id. ¶ 51.  Count One also alleges that Affiliated "conspired to defraud the United States by getting a false or fraudulent claim allowed or paid."  Id. ¶ 53.  Counts Two through Eight assert violations of the state false claims act laws of Florida, id. ¶¶ 59-69, Massachusetts, id. ¶¶ 70-81, Montana, id. ¶¶ 82-92, Tennessee, id. ¶¶ 93-104, Texas, id. ¶¶ 105-115, the District of Columbia, id. ¶¶ 116-126, and Louisiana, id. ¶¶ 127-138.

On April 14, 2009, the United States filed an Election to Decline Intervention in this case, ECF No. 35, and on April 21, 2009, the Court ordered that the case be unsealed, and that the plaintiff/relator serve a copy of the complaint on the defendant, ECF No. 36.  On June 19, 2009, the defendant filed its motion to dismiss.

## II. STANDARDS OF REVIEW

### A.    Motion To Dismiss Under Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance."  Curran v. Holder, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted).  When reviewing a motion to dismiss pursuant to Rule 12(b)(1), the Court must accept as true all of the factual allegations contained in the complaint.  Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination

<u>Unit</u>, 507 U.S. 163, 164 (1993).  Under Rule 12(b)(1), "it is presumed that a cause lies outside [the federal courts'] limited jurisdiction," <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994), unless the plaintiff establishes by a preponderance of the evidence that the Court possesses jurisdiction, <u>see, e.g.</u>, <u>Hollingsworth v. Duff</u>, 444 F. Supp. 2d 61, 63 (D.D.C. 2006).  Therefore, the "plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  <u>Grand Lodge of Fraternal Order of Police v. Ashcroft</u>, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (internal citation and quotation marks omitted).  Furthermore, in determining whether it has jurisdiction over the case, the Court "may consider materials outside of the pleadings." <u>Jerome Stevens Pharm., Inc. v. FDA</u>, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

**B.      <u>Motion To Dismiss Under Rule 12(b)(6)</u>**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the plaintiff has properly stated a claim upon which relief may be granted.  <u>Woodruff v. DiMario</u>, 197 F.R.D. 191, 193 (D.D.C. 2000).  For a complaint to survive a Rule 12(b)(6) motion, it need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds on which it rests," <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (citation omitted).  "Although detailed factual allegations are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the grounds of entitlement to relief, a plaintiff must furnish more than labels and conclusions or a formulaic recitation of the elements of a cause of action."  <u>Hinson ex rel. N.H. v. Merritt Educ. Ctr.</u>, 521 F. Supp. 2d 22, 27 (D.D.C. 2007) (quoting <u>Twombly</u>, 550 U.S. at 555) (internal quotation marks and alterations omitted).  As the Supreme Court recently stated, "[t]o survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, __, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556). A complaint alleging facts which are "'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. (quoting Twombly, 550 U.S. at 557) (brackets omitted). In evaluating a Rule 12(b)(6) motion, "[t]he complaint must be liberally construed in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks and citations omitted), and the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice," E.E.O.C. v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) (footnote omitted).

In addition, "because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)" of the Federal Rules of Civil Procedure. United States ex rel. Totten v. Bombardier Corp., 286 F.3d 542, 551-52 (D.C. Cir. 2002). That rule requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) is not an antithesis of Rule 8(a)'s "short and plain statement" requirement, but rather a supplement to it. Baker v. Gurfein, __ F. Supp. 2d __, No. 09-1480, 2010 WL 4021382, at *3 (D.D.C. Oct. 13, 2010) (Walton, J.) (citing United States ex rel. Williams v. Martin-Baker Aircraft Co., 389 F.3d 1251, 1256 (D.C. Cir. 2004)).

Accordingly, to survive a motion to dismiss for failure to plead a False Claims Act claim with the degree of particularity required by Rule 9(b), a plaintiff must "state the time, place[,] and content of the false misrepresentations, the fact misrepresented[,] and what was retained or given up as a consequence of the fraud." Williams, 389 F.3d at 1256 (citations omitted).  A plaintiff must also "identify individuals allegedly involved in the fraud." Id.

## III. LEGAL ANALYSIS

As noted at the outset of this opinion, the defendant moves to dismiss this case under Rule 12(b)(1), claiming that the Court lacks subject-matter jurisdiction, and under Rule 12(b)(6), claiming that the plaintiff/relator has failed to plead fraud with the requisite particularity.  See Def.'s Mem. at 1-5.  The District of Columbia Circuit has stated that courts should consider Rule 12(b)(1) jurisdictional challenges before addressing Rule 12(b)(6) challenges.  United States ex rel. Settlemire v. District of Columbia, 198 F.3d 913, 920-21 (D.C. Cir. 1999) (citing United States ex. rel. Kreindler & Kriendler v. United Techs. Corp., 985 F.2d 1148, 1155-56 (2d Cir. 1993)).  The Court therefore begins its analysis by first addressing the Rule 12(b)(1) challenge.

## A.      The Challenge to the Court's Subject-Matter Jurisdiction Over Count I

The False Claims Act imposes civil liability on any person who knowingly submits false claims to the government.  See 31 U.S.C. §§ 3729-3733; Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, __ U.S. __, __, 130 S. Ct. 1396, 1400 (2010). To encourage the disclosure of fraud that might otherwise escape detection, the False Claims Act permits private individuals to file qui tam actions on the federal government's behalf against perpetrators of the fraud and to share in the proceeds recovered as a result of successful claims. 31 U.S.C. § 3730(b)(1), (d).  However, not every claim of fraud by a relator qualifies under the False Claims Act; instead, the Act bars federal courts from exercising subject-matter jurisdiction

over certain <u>qui tam</u> actions.  <u>See id.</u> § 3730(e).  Relevant here is what is referred to as the "public disclosure" provision, which provides:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office Report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For the purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

<u>Id.</u> § 3730(e)(4), <u>amended by</u> Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-902 (2010).[3]  "Under this regime, jurisdiction is lacking 'whenever the relator files a complaint describing allegations or transactions substantially similar to those in the public domain, regardless of the actual source for the information in the particular complaint.'"  <u>Settlemire</u>, 198 F.3d at 918 (quoting <u>United States ex rel. Findley v. FPC-Boron Employees' Club</u>, 105 F.3d 675, 682 (D.C. Cir. 1997)).  This jurisdictional scheme represents Congressional attempts to find "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own."  <u>United States ex rel. Springfield Terminal Ry. Co. v. Quinn</u>, 14 F.3d 645, 649 (D.C. Cir. 1994).

Invoking the public disclosure provision, the defendant argues that the Court lacks subject-matter jurisdiction in this case because "there have been multiple disclosures of the

---

[3] This provision was amended on March 23, 2010; however, the amendment is not retroactive.  <u>Graham Cnty.</u>, __ U.S. at __, 130 S. Ct. at 1400 n.1.  The Court, therefore, must apply the version of the statute in force when the Amended Complaint was filed, which the Court has quoted above.

general notion that Medicaid sometimes pays claims for healthcare services for which third-party carriers should have been charged." Def.'s Mem. at 19. As support, the defendant points to several sources, including three Government Accountability Office ("GAO") reports and a Senate subcommittee hearing. See id. at 22-24. For its part, the plaintiff/relator does not dispute that any of the items offered by the defendant can be properly considered by the Court in its jurisdictional inquiry, see Pl.'s Opp'n at 19-30, but represents that "[t]he disclosure of a 'general notion' is insufficient to constitute a public disclosure under the False Claims Act," id. at 20.

"The public disclosure prong of [31 U.S.C.] § 3730(e)[(4)(A)] has two discrete criteria: there must be a public disclosure of allegations or transactions[,] and the qui tam suit must be based upon the public disclosure." United States ex rel. Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 45 (D.D.C. 2007) (internal quotation marks omitted); see Findley, 105 F.3d at 686-87 ("The Act triggers the jurisdictional bar only when there has been a public disclosure of 'allegations or transactions,' which it explicitly refers to in the disjunctive." (citing United States ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 552 n.2 (10th Cir. 1992))). The District of Columbia Circuit explained the significance of the terms "allegation" and "transaction" with an algebraic equation: X (the misrepresented facts) + Y (the true facts) = Z (the fraud). United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc., 422 F. Supp. 2d 225, 234 (D.D.C. 2006) (citing Springfield, 14 F.3d at 654). Qui tam actions are therefore barred only when enough information exists in the public domain to expose the fraudulent transaction (the combination of X and Y), or the allegation of fraud (Z). See Springfield, 14 F.3d at 654. Where only one element of the fraudulent transaction is in the public domain (X), the qui tam plaintiff may mount a case by coming forward with either the additional element necessary to state a case of fraud (Y) or the allegations of fraud itself (Z).

Cooper, 422 F. Supp. 2d at 234 (citing Springfield, 14 F.3d at 655); see also Settlemire, 198 F.3d at 918 ("[W]e inquire only as to whether the publicly disclosed information 'could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing.'" (quoting United States ex. rel. Joseph v. Cannon, 642 F.2d 1373, 1377 (D.C. Cir. 1981))). With the scope of these limitations on the Court's jurisdiction in mind, the Court now turns to the sources relied upon by the defendant as grounds for invoking the public disclosure provision.[4]

First, the defendant cites a 1992 GAO report which concluded that "Medicaid could save millions of dollars if states ensured that liable third parties paid Medicaid recipients' medical bills," and outlined two measures that states could employ to "realize these savings." ECF No. 44-5 at 3. These measures concerned improving compliance with federal requirements that States identify and recover payments from liable health insurers, and improving child support enforcement techniques for the purpose of assuring that noncustodial parents of Medicaid children provide health insurance for their children when it is available through their employers. Id. This document also references a 1990 survey from the Bureau of the Census showing "that 13.2 percent of Medicaid recipients had private or employer-provided health insurance." Id. at 2.

Second, the defendant points to a May 1994 GAO report, entitled "Medicare/Medicaid Data Bank Unlikely to Increase Collections From Other Insurers." ECF No. 44-6 at 2. That report discussed particular aspects of the Omnibus Budget Reconciliation Act of 1993, which directed the establishment of a data bank to "contain information on all workers, spouses, and

---

[4] As with the two reports cited in Part I of this opinion, most of the sources cited by the defendant are attached as exhibits to the Declaration of Douglas W. Baruch, which was submitted with the Defendant's Memorandum of Points and Authorities in Support of its Motion to Dismiss. For ease of reference, the Court will cite to these sources by listing their Electronic Case File number and corresponding page number as assigned by the electronic system and indicated on the top right portion of the document.

dependents that are covered by employer group health plans." Id. at 3. The GAO stated that the purpose of the data bank was "to help (1) identify Medicare and Medicaid beneficiaries who have other health insurance coverage that should pay medical bills ahead of the Medicare and Medicaid programs[,] and (2) ensure that this insurance is appropriately applied to reduce Medicare and Medicaid costs." Id. The report concluded, however, that the data bank "may not measurably strengthen the existing processes for ensuring that beneficiaries' health insurers pay ahead of Medicare and Medicaid." Id.

Third, the defendant offers a March 2005 Congressional Research Service report entitled "State Medicaid Program Administration: A Brief Overview." ECF No. 44-4 at 2. According to this document, "[f]ederal law requires each state to designate a single state agency to administer or supervise the administration of its Medicaid program," and that state agency "will often contract with other public or private entities to perform various [Medicaid] program functions." Id. The report referenced an August 2000 survey that assessed the "operational responsibility for 16 key [Medicaid] functions [and] found that only five states had Medicaid agencies that administered (or shared in the administration of) all 16." Id. However, the survey found that "most functions not directly administered by the Medicaid agency were handled by another state agency or department." Id. That same survey also revealed that "29 states contracted with the private sector to administer" the operation of Medicaid Management Information Systems, "which are [systems] used for claims and other data processing purposes." Id. Several pages later, the report references a July 2004 GAO report which indicated the following:

> Medicaid's size and diversity make[] it vulnerable to improper payments that can result from fraud, abuse, and inadvertent errors. States have taken various approaches to preventing and detecting improper payments to providers, such as tightening provider enrollment controls . . . and using advanced technologies to integrate provider, beneficiary, and claims information to conduct more efficient eligibility, utilization, and billing reviews.

<u>Id.</u> at 6.

Fourth, the defendant points to a 2005 statement delivered by Senator Charles Grassley on the floor of the United States Senate regarding a provision of the Deficit Omnibus Reduction Act of 2005.[5] ECF No. 44-7 at 3-5. Senator Grassley declared that the Medicaid provisions within this legislation would "achieve[] savings by helping State Medicaid Programs obtain millions in payments owed by third-party payers each year." <u>Id.</u> at 4. He also indicated that the legislation "cracks down on Medicaid fraud and abuse by encouraging States to aggressively pursue Medicaid fraud by implementing . . . State false claims acts." <u>Id.</u>

Fifth, the defendant cites a transcript of a March 2006 hearing before a subcommittee of the Senate Committee on Homeland Security and Government Affairs titled "Bolstering The Safety Net: Eliminating Medicaid Fraud." ECF 44-8 at 2. Senator Tom Coburn's opening statement noted that the "unchecked [Medicaid] spending growth would be troublesome enough. However, that's not the end of the story. Unfortunately, fraud and improper payments is [sic] a huge problem in this program. We don't know how huge because nobody is measuring the problem in any sort of systematic way." <u>Id.</u> at 5. In that hearing, Dennis Smith, the Director of the Center for Medicaid and State Operations, testified that "I think that part of the message that I want to carry today is that we are on the right path." <u>Id.</u> at 6. Mr. Smith noted that state collections from liable third-party payers were up from $900 million in 2002 to $1.1 billion in 2005, and he stated that "[i]n terms of cost avoidance, putting edits in your system so you're not paying in the first place, . . . [t]hat is up substantially." <u>Id.</u> He also indicated that determining a

---

[5] Senator Grassley's speech appears in the Congressional Record, which the Court accepts as a type of congressional report as contemplated by 31 U.S.C. § 3730(e)(4)(A). <u>See</u> <u>supra</u> at 11.

payment error rate in the Medicaid program was difficult because the "error rate can come from so many different sources." Id. at 7.

Finally, the defendant cites a September 2006 GAO Report, entitled "Medicaid Third-Party Liability[:] Federal Guidance Needed to Help States Address Continuing Problems." ECF No. 44-3 at 2.[6] This report identified "[p]roblems verifying Medicaid beneficiaries' private health coverage" as one of the top three problems states face in ensuring that Medicaid is the payer or last resort, see id. at 11, 18-20, and found that an estimated thirteen percent of people "who reported having Medicaid coverage for the entire year also reported having private health [insurance] coverage at some time during the same year," id. at 10. In a section describing the verification problems, the report stated the following:

> Verification of available private health coverage for Medicaid beneficiaries is key to ensuring that states are able to appropriately avoid paying claims or to collect from those that are liable. Nevertheless, state officials often told us, one of the top three problems they faced in ensuring that Medicaid was the payer of last resort was related to verifying beneficiaries' other coverage. Some state officials reported their problem broadly, stating, for example, that third parties would not cooperate in providing eligibility or coverage information. Others cited specific problems related to the verification process, stating, for example, that third parties would not assist with the state's verification process by sharing coverage files electronically. . . .

> . . . State officials reported a range of problems they experienced in verifying coverage information. For example, officials in 12 states indicated that certain third parties or their contractors, such as self-insured plans, pharmacy benefit managers, or plan administrators, ignored the state's requests for verification information about Medicaid beneficiaries or declined to verify coverage. Four states reported that third parties cited privacy provisions in the Health Insurance Portability and Accountability Act of 1996 as one reason they could not share coverage information with state Medicaid offices. Additionally, an official in [one] state reported that some third parties would not verify coverage for seasonal

---

[6] Although this report was published in September 2006, approximately two months after the original complaint was filed, it was made public before the Amended Complaint was filed in June 2007. The Court will therefore consider this document in its jurisdictional assessment. See Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473-74 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.").

workers[,] and that some insurance companies limited the number of verifications they were willing to provide during a single phone call.

Id. at 18-20 (footnote omitted).  In discussing how states could better comply with provisions of

the 2006 Deficit Reduction Act, the GAO noted that

> there is also some disagreement in the industry as to whether the statutory provisions regarding the requirement to provide states with coverage and other information apply to certain entities.  According to CMS and officials from the private consulting firm, some entities, such as certain pharmacy benefit managers and plan administrators, have indicated that the requirement that states have laws in effect to require reporting of coverage and related information does not apply to them.  For example, private insurers and health plans may hire pharmacy benefit managers and plan administrators to process the claims – that is, to pay the claims on their behalf – and the pharmacy benefit managers and plan administrators may not view themselves as "legally responsible for payment of a claim for a health care item or service."  Without cooperation from these contracted entities in sharing coverage information and in paying claims, states may continue to have many of the problems they reported.  CMS officials said that they had met with trade associations representing pharmacy benefit managers and plan administrators to discuss and obtain input about these entities' responsibilities under the Deficit Reduction Act.

Id. at 27.[7]

After carefully considering the impact of these sources, the Court concludes that while

they do reveal some important background information, such as the problem of verifying

whether a Medicaid beneficiary has third-party coverage and the difficulties states have in

obtaining payment from third-party payers, this information does not rise to the level of

"allegations or transactions" as contemplated by § 3730(e)(4)(A).  To begin with, none of the

---

[7]  As another type of public disclosure, the defendant refers the Court to contracts that Affiliated has "with multiple states to assist in the administration of state Medicaid programs through its [pharmacy benefits management] and [Medicaid Management Information Systems] services."  Def.'s Mem. at 24.  The defendant represents that these "contracts are publicly bid, and the awards are published."  Id.  In conducting its assessment of the public disclosures, however, 31 U.S.C. § 3730(e)(4)(A) expressly limits the Court to disclosures in "a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media."  Unlike the Senate floor speech, supra note 5, the Court does not see how anything on this statutory list of sources would encompass a contract to perform services between a private entity and a state Medicaid agency.  Nor has any supporting documentation (such as a story about these contracts in the news media) been provided.  As such, the Court will not consider the impact of these contracts in its jurisdictional inquiry.

disclosures mention Affiliated, let alone <u>any</u> other specific entity.  The fact that twenty-nine states contract in some fashion with "private entities" to administer one particular aspect of their Medicaid programs, as noted in the Congressional Research Service Report, ECF No. 44-4 at 2, may limit the field to a relatively narrow range of actors, but the more relevant inquiry is whether the documents disclose any "allegations or transactions" that trigger the False Claims Act's "jurisdictional bar."  <u>See</u> <u>Findley</u>, 105 F.3d at 686-87.  On that front, the Congressional Research Service's discussion about reducing improper payments to providers does not elaborate on how, or how many, pharmacy benefits managers or fiscal agents might be responsible for the fraud or abuse in the Medicaid system.  <u>See</u> ECF No. 44-4 at 6.  Indeed, the report suggested that improper payments could be the result of "inadvertent errors" and not necessarily fraud and abuse.  <u>Id.</u>  Thus, there is nothing in this report from which the Court can infer an allegation that Affiliated engaged in fraud.

The three GAO reports are also devoid of any allegations of fraud or wrongdoing by anyone.  The 1992 and 1994 GAO reports indicate that states have difficulty identifying and recovering payments from third-party insurers, which is attributable in part to the limited authority states have over out-of-state insurance companies and the short deadlines in the Medicaid recovery process.  <u>See</u> ECF No. 44-5 at 4; ECF No. 44-6 at 10-11.  However, these reports do not discuss the role of Medicaid fiscal agents or pharmacy benefits managers, much less any particulars regarding how claims are processed and submitted to state Medicaid agencies.

As for the 2006 GAO report, at most it expresses some dissatisfaction with the entities that were apparently uncooperative with state Medicaid officials' requests for coverage information, <u>see</u> ECF No. 44-3 at 18-20, but it stops short of making an allegation of fraud or

improper conduct. In fact, the report discusses how pharmacy benefits managers and plan administrators may have acted in good-faith because they believed that a specific law did not apply to them, and they provided input to federal government officials about their responsibilities under the statute. Id. at 27. See United States ex rel. Davis v. Prince, __ F. Supp. 2d __, __, No. 08-1244, 2011 WL 63899, at *11 (E.D. Va. Jan. 5, 2011) ("To be sure, the audit report clearly expresses dissatisfaction with the fact that Blackwater does not require its employees to fill out time sheets in which they certify the number of hours worked each day, but there is no allegation of fraud or wrongdoing by anyone."); United States ex rel. Ven-A-Care v. Actavis Mid Atl. LLC, 659 F. Supp. 2d 262, 267 (D. Mass. 2009) (finding that even though government reports established that Medicaid was paying too much for drugs, the reports did not "broadcast" an allegation of fraud because there was no discussion of the reasons for the overcharge or any suggestion of wrongdoing by the defendants); United States ex rel. Mikes v. Straus, 931 F. Supp. 248, 254-55 (S.D.N.Y. 1996) (determining that the public disclosure provision did not apply when the disclosures contained no allegation of fraud and referred to a different type of transaction). The GAO reports, therefore, do not reveal any allegations against Affiliated that would place this case outside the Court's jurisdiction.

The statements from Senators Grassley and Coburn, as well as the testimony from Dennis Smith, certainly speak to problems concerning the Medicaid program obtaining payments from third-party payers and the federal government's concern and efforts to address the problem. See ECF No. 44-7 at 3-5; ECF No. 44-8 at 5-8. Yet, they do not identify any particular forms of fraud that may have been contributing to the Medicaid third-party payer problem or allege wrongdoing on the part of pharmacy benefits managers or Medicaid fiscal agents. At most, Senator Coburn recognized that "nobody is measuring the problem [of Medicaid fraud and

improper payments] in any sort of systematic way," ECF No. 44-8 at 5, and Senator Grassley even encouraged states to adopt their own version of the federal False Claims Act to pursue Medicaid fraud, which on the federal level he said is "the single most important tool that U.S. taxpayers have to recover the billions of dollars stolen through fraud every year," ECF No. 44-7 at 4. Moreover, on the issue of determining an accurate number of payment error rates in the Medicaid program, Dennis Smith testified that this was

> [n]ot an easy thing to do, as you can imagine, as States – I mean, your error rate can come from so many different sources. It can be a provider issue. It can be an eligibility issue. It can come from a variety of different angles. And that will be a challenge, quite frankly, to work through all of those issues to get to a reliable and verifiable payment error rate.

ECF No. 44-8 at 7-8. Thus, while the government may be aware of fraud and improper payments being made by participants in the Medicaid program on a general level, it was not "squarely on the trail" of the defendant. United States ex rel. Fine v. Sandia Corp., 70 F.3d 568, 571 (10th Cir. 1995).

In the context of what is alleged in this case, the plaintiff/relator's theory is that the defendant, in its role as a Medicaid fiscal agent and pharmacy benefits manager, failed to implement proper technology to screen Medicaid claimants for third-party coverage despite knowing that as many as one-third of these claimants may have such coverage. According to this theory, the defendant is therefore facilitating the submission of fraudulent Medicaid claims when the state Medicaid agencies submit accounting information to the federal government. See Am. Compl. ¶¶ 38-40, 51; Pl's Opp'n at 30. In the lexicon of Springfield, none of the sources relied upon by the defendant reveal an allegation of fraud (the Z result), or any transaction of fraud (the combination of X and Y factors), as they fail to identify any schemes, the existence of both a misrepresented state of facts and a true state of facts, or otherwise suggest an exchange

between two parties.  See Springfield, 14 F.3d at 654 (explaining that "[t]he term 'transaction' suggests an exchange between two parties or things that reciprocally affect or influence one another").

The Court also finds guidance in other cases that have considered when public disclosures have triggered the jurisdictional bar.  In Sandia, for example, the relator claimed that the defendant was misappropriating nuclear waste funds.  70 F.3d at 571.  A prior GAO report and congressional hearing had disclosed that contractors operating at two of the Department of Energy's nine multi-program laboratories were engaging in this practice.  See id. at 569-70. While Sandia was not named in these public disclosures, the Tenth Circuit reasoned that the public disclosure bar had been triggered "[b]ecause these disclosures detailed the mechanics of the practice, revealed that at least two of Sandia's eight sister laboratories were engaged in it, and indicated the [Department of Energy's] acquiescence."  Id. at 571; accord In re Natural Gas Royalties, 562 F.3d 1032, 1042 & n.4 (10th Cir. 2009) (finding a public disclosure of allegations where the public disclosures at issue "named a significant percentage of industry participants as wrongdoers and indicated that others in the industry were very likely engaged in the same practices").

Similarly, in Findley, the District of Columbia Circuit affirmed a district court decision which found that "the practice of government employees' clubs retaining vending machine income was widely known at the time [the suit] was brought" and was therefore barred by the public disclosure provision.  105 F.3d at 678.  The public disclosures in that case, which did not name the defendant, consisted of a 1952 Comptroller General Opinion, the legislative history of the Randolph-Sheppard Act, and an opinion from the United States Court of Appeals for the Federal Circuit.  Id. at 685.  After reviewing those items, the circuit court remarked that "[e]ach

of the public disclosures that we rely on raises the specter of 'foul play' by <u>acknowledging the</u> <u>questionable legality</u> of permitting federal employees to use federal facilities for the provision of vending services and retaining revenue from such services." <u>Id.</u> at 687 (emphasis added). The court added that these sources "specifically identify the nature of the fraud . . . as well as the federal employee actors engaged in the allegedly fraudulent activity." <u>Id.</u>

Finally, in <u>Settlemire</u>, the relator claimed that the District of Columbia had "spent funds appropriated by the United States for purposes other than those intended by Congress." 198 F.3d at 915. Congress had appropriated approximately $17 million for certain specified activities related to the Metropolitan Police Department. <u>Id.</u> at 916. During testimony before a Senate subcommittee, however, the Chief of Police testified as to his belief that these funds were "virtually unencumbered in the way that the Congress intended us to use it, as long as it was used specifically for law enforcement purposes." <u>Id.</u> at 919. The District of Columbia Circuit determined that because "District officials disclosed in public Congressional hearings that they were using the funds for purposes beyond those listed in the Expansion Act," that testimony "enable[d] the government to adequately investigate the case and to make a decision whether to prosecute." <u>Id.</u> (quotation marks and citation omitted). The court noted that "[c]ases may arise where disclosures of a practice are insufficient to be considered public disclosures of later instances of fraud," but found that "where we have before us publicly disclosed information showing how this same defendant intended to spend monies appropriated under this same statute, it is clear that public disclosure under § 3730(e)(4)(A) has occurred." <u>Id.</u>

In this case, unlike <u>Sandia</u>, <u>Findley</u>, and <u>Settlemire</u>, the public disclosures did not suggest where the fraud was occurring, what percent of actors within the industry were purportedly engaged in it, the nature of any schemes used to facilitate the payment of false Medicaid claims,

or any specific entities that allegedly engaged in such activity. As recently observed by the Seventh Circuit, "[a]s far as we can tell, no court of appeals supports the view that a report documenting widespread false claims, but not attributing them to anyone in particular, blocks <u>qui tam</u> litigation against every member of the entire industry." <u>United States ex rel. Baltazar v. Warden</u>, __ F.3d. __, __, No. 09-2167, 2011 WL 559393, at *3 (7th Cir. Feb. 18, 2011); <u>see</u> <u>Cooper v. Blue Cross & Blue Shield of Fla. Inc.</u>, 19 F.3d 562, 566 (11th Cir. 1994) (indicating that a GAO report discussing widespread Medicare Secondary Payer fraud, which names other insurance companies but did not mention Blue Cross Blue Shield, was insufficient to trigger the public disclosure bar). While "determining whether 'allegations or transactions' have been 'public[ly] disclos[ed]' will never be cut-and-dried," <u>Springfield</u>, 14 F.3d at 656, the Court concludes that the public disclosures here did not reveal any "allegations or transactions" for the purposes of § 3730(e)(4)(A).[8] Accordingly, the defendant's motion to dismiss for lack of subject-matter jurisdiction will be denied.

**B.**     **The Amended Complaint Fails To Plead Fraud With Particularity**

The defendant also argues that the Amended Complaint fails to satisfy Rule 9(b) of the Federal Rules of Civil Procedure. <u>See</u> Def.'s Mem. at 1-4, 8-18. Among other inadequacies, the defendant contends that the Amended Complaint "fails to specify (1) any specific claim for payment submitted to the government, (2) the time and place of any of the purportedly fraudulent claims, or (3) which representatives of [Affiliated] allegedly committed the wrongful acts." <u>Id.</u> at 13. The plaintiff/relator argues that it is not required to plead evidence supporting its claim at this stage and that the Amended Complaint is sufficiently specific. <u>See</u> Pl.'s Opp'n at 10-19.

---

[8] Having made this determination, the Court need not consider whether the plaintiff/relator was an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A); <u>Springfield</u>, 14 F.3d at 651.

Upon reviewing the Amended Complaint, the Court agrees with the defendant that it fails to satisfy the particularity requirement imposed by Rule 9(b). Notably, the Amended Complaint fails to identify any individual associated with Affiliated who was involved in the purported fraudulent activity. See generally Am. Compl. This is not in keeping with the law in this circuit, which "require[s] pleaders to identify individuals allegedly involved in the fraud." Williams, 389 F.3d at 1256; see also id. at 1257 (finding a lack of specificity when the complaint "repeatedly refers generally to 'management' and provides a long list of names without ever explaining the role these individuals played in the alleged fraud"); United States ex rel. Bender v. N. Am. Telecomms., Inc., 686 F. Supp. 2d 46, 53-54 (D.D.C. 2010) ("[False Claims Act] cases in this circuit reveal that specificity regarding the identities of individual actors is required." (citation omitted)); Martin v. Arc of D.C., 541 F. Supp. 2d 77, 83 (D.D.C. 2008) ("[P]laintiff fails to plead with particularity a viable claim under the [False Claims Act] because the complaint fails to identify who, if anyone, made a false representation to the government and fails to provide any of the purported details such as the time, place, and contents of the alleged false representation."). The failure to identify anyone allegedly engaged in the fraud is especially troubling because the plaintiff/relator is claiming that the defendant is involved in a conspiracy that is responsible for the submission of "tens of thousands" of false Medicaid claims to the United States since 2002. Am. Compl. ¶¶ 37, 53. Such imprecise pleading not only fails to give Affiliated sufficient information to respond to the conspiracy accusation, but also subjects it "to vague, potentially damaging accusations of fraud," which is precisely what Rule 9(b) seeks to avoid. Williams, 389 F.3d at 1257.

Another shortcoming of the Amended Complaint is that it does not identify a single false claim submitted to the federal government for Medicaid reimbursement or any claim improperly

paid by Medicaid. For example, the plaintiff/relator alleges that "[s]ince at least December 17, 2002, [Affiliated] has caused tens of thousands of improper claims to be submitted to Medicaid each month in its capacity as a Medicaid pharmacy benefits manager . . . and as a Medicaid fiscal agent." Am. Compl. ¶ 37. Yet, these broad allegations do not specify any representative claims from among these "tens of thousands," which would obviously be critical in providing Affiliated "sufficient information to allow for preparation of a response." Joseph, 642 F.2d at 1385; see United States ex rel. Brown v. Aramark Corp., 591 F. Supp. 2d 68, 74 (D.D.C. 2008) ("[A] relator must provide details that identify particular false claims for payment that were submitted to the government." (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004))); United States ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 28, 35 (D.D.C. 2003) ("While a complaint that covers a multi-year period may not be required by Rule 9(b) to contain a detailed allegation of all facts supporting each and every instance of submission of a false claim, some information on the false claims must be included." (emphasis added)). The plaintiff/relator's complaint, therefore, lacks the specificity that Rule 9(b) requires.

The plaintiff/relator quotes at length from United States ex rel. Harris v. Bernad, 275 F. Supp. 2d 1 (D.D.C. 2003), as support for its position. Pl.'s Opp'n at 12-13. However, the Court's reasoning in Harris does not provide a lifeline for the plaintiff/relator. There, in a case concerning an alleged Medicare "upcoding" scheme, Judge Urbina denied a Rule 9(b) challenge in part because the government pointed to information in twelve patient files which "provide[d] the specificity required in complex fraud cases, even if these patients' cases are only exemplary." 275 F. Supp. 2d at 8. In this case, while the plaintiff/relator asserts that the Amended Complaint "alleges examples of the thousands of claims for which third-party insurance existed," Pl.'s

Opp'n at 13, that is simply not correct. No examples, even exemplary ones, are provided in the Amended Complaint.

The plaintiff/relator points out that Affiliated is in exclusive possession of certain information that prevents it from itemizing its claims or otherwise showing that the claims were falsely processed. See Pl.'s Opp'n at 11, 16. If that is the case, "this circuit provides an avenue for plaintiffs unable to meet the particularity standard because defendants control the relevant documents–plaintiffs in such straits may allege lack of access in the complaint." Williams, 389 F.3d at 1258. The same concept applies to pleadings based upon "information and belief," which generally do not satisfy Rule 9(b)'s particularity requirement. See United States ex rel. Davis v. District of Columbia, 591 F. Supp. 2d 30, 37 (D.D.C. 2008) ("A relator invoking this exception must plead a lack of access to necessary information in the complaint." (citing Williams, 389 F.3d at 1258)). In its current iteration, however, the Amended Complaint fails to allege anything about a lack of access. Accordingly, the Court concludes that the plaintiff/relator has failed to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). The defendant's motion to dismiss will be granted and Count One will be dismissed without prejudice.[9]

---

[9] 31 U.S.C. § 3730(b)(1) provides that private actions under the False Claims Act may be dismissed "only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." The Court previously noted that "should the relator or the defendant propose that this action be dismissed, settled, or otherwise discontinued, the Court will solicit the written consent of the United States before ruling or granting its approval." Order, ECF No. 36 ¶ 7. This provision, however, pertains "only to voluntary dismissals, and does not prevent a court from dismissing an action, without prejudice, without obtaining the consent of the Attorney General." United States ex rel. Baggan v. DME Corp., No. 96-1983, 1997 WL 600569, at *3 n.6 (D.D.C. Sept. 22, 1997) (citing Minotti v. Lensink, 895 F.2d 100, 103-04 (2d Cir. 1990); see also United States ex rel. Mergent Services v. Flaherty, 540 F.3d 89, 91 (2d Cir. 2008) ("[W]e have previously construed this provision to apply 'only in cases where a plaintiff seeks voluntary dismissal of a claim or action brought under the False Claims Act, and not where the court orders dismissal.'") (quoting Minotti, 895 F.2d at 103). Because the plaintiff/relator is not seeking a voluntary dismissal, and as explained infra, the plaintiff/relator will be granted leave to further amend its complaint, the Court did not solicit the written consent of the United States before issuing this Memorandum Opinion, the Order issued on March 31, 2011, and the Final Order that will be issued contemporaneously with this Opinion.

**C.**     <u>The Remaining State Law Claims Will Be Dismissed</u>

The remaining seven counts of the Complaint allege violations of the analogous False Claims Act statutes of several states and the District of Columbia. Am. Compl. ¶¶ 59-139. While these claims are not based on federal law, a court with original federal jurisdiction over certain claims has supplemental jurisdiction over state law claims "that are so related . . . that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a) (2006). "In order for a federal claim and a state-law claim to form part of the 'same case or controversy,' the claims must derive from a 'common nucleus of operative fact.'" <u>Taylor v. District of Columbia</u>, 626 F. Supp. 2d 25, 28 (D.D.C. 2009) (quoting <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966)).

While the Amended Complaint requests that the Court exercise pendent jurisdiction over the non-federal claims because they allegedly arise from the same factual conduct as the federal claim, <u>see, e.g.</u>, Am. Compl. ¶¶ 68, 103, "[p]endent jurisdiction is a doctrine of discretion, not a plaintiff's right." <u>Shekoyan v. Sibley Int'l</u>, 409 F.3d 414, 423 (D.C. Cir. 2005) (quoting <u>Gibbs</u>, 383 U.S. at 726). "[I]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Id.</u> at 424 (quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988)). Here, having dismissed the lone federal claim, the Court declines to exercise jurisdiction over the remaining state law claims. Counts Two through Eight will therefore be dismissed without prejudice.

**D.** **Leave To Amend Is Granted**

In lieu of dismissal, the plaintiff/relator requests that the Court either treat its opposition as an amendment to the complaint or, in the alternative, grant it leave to amend. See Pl.'s Opp'n at 34-36. The defendant counters that the opposition merely repeats the allegations already contained in the Amended Complaint, and asserts that granting leave would be futile because the plaintiff/relator has already revealed the contents of a second amended complaint through the information in its opposition. See Def.'s Reply at 3-4, 20-21.

It is true that for Rule 9(b) purposes courts may allow a party to supplement its complaint through legal memoranda for the sake of judicial economy. Shekoyan v. Sibley Int'l Corp., 217 F. Supp. 2d 59, 73-74 (D.D.C. 2002) (Walton, J.), aff'd, 409 F.3d 414. Even if the Court did so here, however, the material in the opposition would not salvage the plaintiff/relator's federal claim in the face of the Rule 9(b) challenge. So far as the Court can discern, the only new information in the opposition is the affidavit provided by Nathan Hodgen, "an information technology specialist." Pl.'s Opp'n, Ex. A (Affidavit of Nathan Hodgen) ¶ 1. The information in this affidavit, however, pertains only to Mr. Hodgen's efforts to evaluate studies regarding the coordination of Medicaid benefits, see id. ¶¶ 1-10, and added nothing concerning the alleged perpetrators of any acts of fraud or any information regarding specific false claims. Thus, the plaintiff/relator would acquire no benefit from the Court incorporating its opposition into the Complaint.

Nevertheless, the Court is not convinced that allowing the plaintiff/relator to amend the complaint would be futile. Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires," and this Court has previously recognized that leave to amend is "almost always" permitted to cure deficient pleadings concerning claims of

fraud.  <u>Shekoyan</u>, 217 F. Supp. 2d at 74 (quoting <u>Firestone v. Firestone</u>, 76 F.3d 1205, 1209 (D.C. Cir. 1996)).  Despite the age of this case, it is still in a relatively early procedural status and the Court is reluctant at this point to draw any conclusions about the futility of a hypothetical second amended complaint.  <u>See</u> <u>Rumber v. District of Columbia</u>, 598 F. Supp. 2d 97, 102 (D.D.C. 2009) (noting that "[a]n amended complaint is futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory[,] or could not withstand a motion to dismiss." (citations omitted)).  Accordingly, the Court will grant the plaintiff/relator leave to amend its complaint in order to cure the deficiencies outlined above, if it is possible to do so.

## IV.  CONCLUSION

For the reasons set forth above, the Court concludes that it has subject-matter jurisdiction over the plaintiff/relator's federal False Claims Act claim, but that the plaintiff/relator has failed to plead fraud with the particularity required by the Federal Rules of Civil Procedure.  The Court further concludes that it will not exercise supplemental jurisdiction over the state law counts if the plaintiff/relator cannot bring its Complaint into compliance with Rule 9(b).  The plaintiff/relator therefore will be granted leave to amend its complaint, and is instructed to file one, if it intends to do so, by May 16, 2011.[10]

**SO ORDERED** this 20th day of April, 2011.

REGGIE B. WALTON
United States District Judge

---

[10]  A final order will be issued contemporaneously with this memorandum opinion (1) denying the defendant's motion to dismiss for lack of subject matter jurisdiction, (2) granting the defendant's motion to dismiss for failure to plead fraud with particularity, (3) dismissing the state law claims without prejudice, and (4) granting the plaintiff/relator leave to amend its complaint.